May it please the Court, Kip Edwards for the E and J Gallo Winery. Your Honors, this appeal involves the case or controversy requirement and the mootness doctrine. And according to the District Court, it also involves the ripeness doctrine. When Gallo filed its complaint for declaratory relief, it presented, I suggest, a classic instance of declaratory relief. Blue Ridge, on the one hand, Blue Ridge being a distributor of Gallo products, had signed a binding letter of intent to transfer... But they backed out. They abandoned it. So why... Have you looked at our in-bank opinion in Yahoo? Yes, sir, I have. And you saw the great debate there about ripeness and staying away from issues that aren't fully developed. Here you have, as I understand it, a situation now where the nature of your claim is to ask us to declare that the North Carolina statute would be unconstitutional, as applied to Gallo's contract, which was entered into shortly before that statute was enacted in 1983. Is that correct? Yes, that it would... And we should reach out to reach that constitutional federalism question, even though at the moment there's no overt act on the part of Blue Ridge to change its arrangement? Yes, Your Honor, that is our position. I can't prove that since I lost on Yahoo. I'd be interested in how you're going to help me resonate with that on Gallo. This Court repeatedly has faced the scenario that this case presents. A suit for declaratory relief, sometimes injunctive of relief as well, that is a case for controversy when it's filed. And then in response to that lawsuit, the declaratory relief defendant, in some nonbinding way, stops doing what he's doing or what he's threatening to do. And there are lots of examples. The mootness. What about ripeness? Well, because I think mootness, Your Honor, answers ripeness. Okay. This Court, including its most recent case in the LGS Architects case, has said in those circumstances that the case will not become moot unless it's absolutely certain that the conduct's not going to recur again in the future. And in the most recent case, LGS Architects, the defendant came in and represented to the Court, I won't do it again. And the Court there said that's not enough to make it absolutely certain, because if that were the case, anybody could move the case by saying I won't do it again. Accordingly, that exception to the mootness doctrine is an exception to mootness, but it's not an exception to the case or controversy requirement. In other words, the Court's not saying because they stopped doing the conduct, the case is moot, but we're going to go ahead and decide it anyway. Constitutionally, it could not be. There still has to be a case or controversy. In those cases, therefore, there remains a case or controversy, notwithstanding the temporary nonbinding secession of the conduct that triggered the lawsuit. Well, but, you know, your premise there, your minor premise, is just incorrect. There's lots of situations where, in fact, there is no further case or controversy, and nevertheless, as a constitutional matter, we continue to treat it as if there were, because of some prudential reason. Roe v. Wade is your classic example of that. There was no longer a pregnant woman there, so there's no possibility of an abortion. But, you know, every time you have the capable of a prudential yet evading review exception to mootness, you have a situation where constitutionally we have created a controversy out of nothing for prudential reasons, even though constitutionally there's no actual controversy on the table. So the idea that there must be some sort of controversy there because otherwise we couldn't decide the case, you know, just doesn't follow. Well. What happens with the cessation cases is it's another one of those prudential doctrines. It has nothing to do with the actual controversy. What it says is we will not allow a project to manipulate the process by ceasing the controversy and thereby sort of pulling the rabbit away, you know, so we have to keep chasing it. And even though there is no live controversy, we will use this doctrine to manufacture a case. That's all it is. It does not prove that there's an actual case there. But that's exactly what's going on here. Well, it's really not. I mean, they had a deal. The deal fell through. This is not something, you know, making a deal with somebody. There's no indication that there's a deal in the wings waiting to be resurrected. You don't have any evidence of that. This was a charade, the giving up of the deal as a charade. There's no, you know, finding another partner to murder. This is not a trivial matter. This is not something just within their whim. Your Honor, I think what's going on here is that this is an attempt by Blue Ridge to get this dispute heard in North Carolina, probably before the North Carolina ABC. You want this dispute to be heard in California. Gallo is from California. The others are from North Carolina. Isn't this really underneath it all some sort of effort at foreign shopping so that you get into the preferred jurisdiction? Each of you seems to want to do that, I suspect. Well, Your Honor, we have a forum selection clause in the agreement that calls for a Fresno forum. We have, in fact, offered in our reply brief to dismiss this appeal if they would agree that if it comes up again, we'll have it heard in Fresno. They have already had their chance on the WINE Act in terms of North Carolina because they asked Judge Ishii to transfer this case to North Carolina, saying the WINE Act basically made our forum selection clause no good. Judge Ishii said, I'll assume for purposes of this notion that the WINE Act applies, and the forum selection clause doesn't. And he nonetheless kept it here. But let me return. Your suspicion that they are trying to shift it, you know, this is why you have investigators. If you think that's why you can try to get a discovery or something of that sort, if you think they have a secret deal that's on the table, that they are just waiting for this case to be dismissed in order to resurrect, that would be enough to maintain a controversy. The problem is it's just a guess in your mind. It's not a fact. What we have, Your Honor, in comparison to all of the other voluntary cessation cases where people have come in and said, I won't do it again, we have Blue Ridge saying often, we really want to transfer the Gallo brands to this new company, United, and we think you, Gallo, your obligation to consent to that is governed by the WINE Act. Let me follow up on Your Honor's question. If this Court were to affirm. Where is it in the record? It's in the record throughout, Your Honor, that from the time they first told us they were going to transfer. That's not a good answer. I'm sorry? Throughout is not a good answer. I can give the brief, Your Honor, but I don't think that's a disputed fact. They told us when they first told us they were going to transfer the brands, and then later on changed their mind. They said we still prefer to transfer these brands to United. But that's quite different from what you just represented me. Oh, they've repeatedly said we want to transfer these brands. I mean, that sounds to me like for years and years and years, they're just sort of saying all along. I mean, yes, sure, they have a deal. The deal, and they say that's what we want to do. The deal falls through. What do you have in the record that supports the idea that there is some sort of secret deal still pending? I have nothing to suggest that they're being dishonest with us in the Court and that they have somebody waiting in the wings. We know they have United. We know they've transferred everything else to United, and we know, and I'll find it if I can while I'm speaking, that they have told us they prefer to transfer the Gallo brands to United. Okay. All right? That's what we have. Not enough. Not enough for a case of controversy? Not enough for a case of controversy. Well, I mean, if that's all you have, you lose. I mean, they had a deal. The deal fell through. Sure, they prefer lots of people prefer lots of things. That does not make a case of controversy. It takes two to tangle. They don't have a partner. They can't tangle. You know, lots of people want to tangle, but, you know, they don't have a partner. If Your Honor is saying that the mootness exception cases, where the Court says notwithstanding what's happened, the case is not moot, if that does not mean that there's also a case of controversy there. I have a question. The financial doctrine, it's not that there is an actual case. What we're saying is if you at will can drop the controversy and restart it, drop it and restart it at will, then we're going to act as if you have dropped it. It is not that you actually have a controversy. Just like in Roe v. Wade, it's not like you actually have a pregnant woman. You didn't have a pregnant woman. Sarah Whitington was no longer pregnant by the time the case came up in the Supreme Court. No doubt about it, she wasn't. I mean, the baby had been delivered. So there was no actual case. It was a prudential doctrine that was brought in as a substitute for an actual case. You can't have it whenever somebody seizes a controversy for legitimate reasons. It's only when they do it at will and can pick it up at will. You've said that they haven't got a deal on the table. I don't know what else you know. We know of no deal. Why do you want to litigate this case now in California? What is it that you really, as a practical matter, are seeking to accomplish? What are you really concerned about? We are concerned, Your Honor, first of all, with being able to enforce our contract and the form selection clause. But beyond that, we are concerned about the following situation, and I think this responds to Judge Fischer's question about ripeness. Once this case is final, assume this Court affirms, I hope it doesn't, but let's assume it does, and Blue Ridge transfers the Gallo brands. They can go to North Carolina. They can bring a declaratory judgment action there, I guess, right? They would just go into the ABC, who has declaratory judgment power, and now here's Gallo. What are we to do? Give up our contract rights and not get a decision on the Wine Act, because if we go to the ABC, we've given up all our contract rights, including our form selection clause, but the ABC can't determine this Wine Act issue. They are charged with enforcing the Wine Act. They can't decide whether it's constitutional to apply it retroactively to this contract. That's what we're trying to avoid doing. So you think you have no remedy whatsoever to raise the constitutionality of the Wine Act? I don't know where we'd raise it. We could not raise it, as I understand North Carolina law. We couldn't raise it in the North Carolina ABC. You can't raise it in any state or federal court in North Carolina? We probably could. Or raise it out here? File? File a new litigation. I don't know whether you can or can't. If the scenario happens that we're worried about, if they transfer the brands and go to the North Carolina ABC, would we file an action out here and try and enjoin the ABC? I don't know if we could do that. Part of your burden is also to show hardship. So assuming you could file a reinitiated declaratory relief action out here and argue that you don't have any effective remedy in North Carolina to raise the act, constitutionality of the act, I don't know if that gives you some ground or not. As I understand North Carolina law, and it's in our briefs, the North Carolina ABC can't decide the issue. I understand that you have that problem. That's why the Board of Immigration Appeals can't decide constitutional questions. But that doesn't mean you don't have some forum in which to raise a constitutional question. You may have to go to file an action in state court or appeal from the ABC decision or whatever. I just don't know. But I don't understand the – I understand what is at stake in terms of home turf advantage and all of that and the contract. But in terms of whether we should then, as a matter of prudence, without any information as to what your alternative remedies are really, decide, yes, we should go ahead, yes, we should make a declaration of North Carolina's statute is unconstitutional, I don't even know what the issues, quite frankly, would be that we'd have to decide because it would presumably be an as-applied challenge. So I think that's your problem. Perhaps I'm not being clear. We're not challenging the constitutionality of the Wine Act. Well, you are as applied. You're saying it would be – if it's retroactive, it would be a – Violate the contract clause. Yeah, the contract clause of the Constitution. Exactly. Now, if the scenario that we're concerned about happened, we could file another declaratory action relief – declaratory relief action in Fresno, but we would also be required at the pain of fines and damages and suspension and so forth to also go to North Carolina and participate in that ABC proceeding. And then depending on how that comes out, as Your Honor suggests, there might be an appeal from that where we could then raise the issues. And now we have it in two courts. But that's our concern. And with respect to the other – pardon me – the other prudential part of that, it is, as judges acknowledged twice, fairly a legal issue that was fully briefed before him. Okay. Thank you, Your Honor. Thank you. Your Honor, I'm Michael Crowell here representing Blue Ridge. Gallo does have a way to challenge the constitutionality of an application of the Lyon Franchise Act if in the future Blue Ridge should decide to merge. First of all, Gallo wouldn't be caught by surprise under both the franchise agreement and under the North Carolina Franchise Law. Blue Ridge would need to give notice to Gallo and to seek Gallo's approval before any merger, just as it did in this instance before the deal fell through. What Blue Ridge would also need to do would be to tell Gallo that it intended to go ahead with the merger, regardless of whether Gallo was going to consent or not. Would Blue Ridge be in a position to initiate its own declaratory relief action in North Carolina, in either state or federal court, to get local venue advantage? Yes, there are several ways. You'd give them notice, but that assumes Blue Ridge isn't also doing something aggressively on its own side of the country to preempt the expected Fresno refile litigation. Isn't that correct? Well, my point is that before Blue Ridge can do anything in North Carolina, if it's going to choose to do so, it has to meet the requirement of giving Gallo notice. Under which law? Under what? Well, it is under both the agreement with Gallo and it's under the North Carolina Lyon Franchise Law. But you give notice and you file concurrent same-day declaratory relief action in North Carolina. I don't know how they would file a declaratory judgment action if Gallo had not responded and Gallo had not turned down the merger. So I just want to make sure I understand the scenario. The scenario is there's no hardship here because Gallo has its contract, and under the contract and under North Carolina law, which Blue Ridge does believe is applicable, Blue Ridge would have to give notice. And before it could initiate any action to declare that the contract is superseded by the North Carolina statute, Gallo would have the opportunity to act or not act under the contract. And therefore, if Gallo were concerned about Blue Ridge actually proceeding, Gallo would have plenty of time to file its declaratory relief action here in the Eastern District. Or in North Carolina. Or in North Carolina, but at least it would have the initiative. And that's exactly... Before Blue Ridge could act. Is that what you're telling us? Yes. Okay. And that's exactly what happened in the North Carolina case in 1985 in which the Federal Court for the Eastern District of North Carolina decided that the wine franchise law does apply retroactively. What happened was that's the Empire Distributors v. Hugh Blind Wines, a California distributor, a California winery. And there were discussions about transfer. Hugh Blind told State Distributing Corporation, which wanted to transfer its rights, that it couldn't do so, that Hugh Blind was not going to approve it. Empire went ahead, bought that wholesalership. Hugh Blind filed a declaratory judgment action in California. And it ended up being transferred to North Carolina. Gallo also could file a declaratory judgment action in North Carolina in either Federal Court or State Superior Court. Even if there were a proceeding before the ABC Commission, there's nothing about that proceeding that makes it exclusive and that prevents Gallo from going to a Superior Court in North Carolina to seek a declaratory judgment action that the franchise law does not apply retroactively and thus doesn't apply to any dispute with Blue Ridge, and thus the ABC Commission has no jurisdiction. Let me ask you this. If we were to affirm the district court's judgment and say that we're not going to take this case, are you telling me that you have no plans, you meaning Blue Ridge, to file a declaratory judgment action in North Carolina, that it's not within your contemplation, it's not a thought whatsoever, and that there is no reasonable expectation that this will happen? There are no plans to. Yes, I can assure you there's been no discussion of no plans of filing a declaratory judgment action in North Carolina. Now, at some time in the future, Blue Ridge may consider merging, transferring its rights to United or another company. That's the nature of the beer and wine business today. It is a consolidation. But there are no plans at the present time, and he was saying this, there's a record that we're keeping of this, for any of this activity to happen. Is that what you're representing to the point? No plans at the present time. And what the record shows in this case, what the record shows is there was never a ripe case or controversy in the first place. If you look through, what you see is that there were two businesses. They were negotiating. They were discussing the merger of Blue Ridge. They were stating their positions about that. They had long-term discussions about it. It went on for over an eight-month period. At no point during that did Blue Ridge ever suggest it was going to sue Gallo. Did Blue Ridge ever suggest it was going to proceed with the merger without Gallo's consent? If you look at the record, Gallo makes it sound as if the wine franchise law and its applicability was up front and center throughout this, and there was this overriding threat of litigation. It's just not borne out by the record. The correspondence about this is attached to the affidavit of Bill Backus, who's the regional representative for Gallo in North Carolina. The letter on page 81 is the letter from Phil Morgison, the letter for Blue Ridge to Gallo, notifying Gallo of Blue Ridge's intent, Blue Ridge's desire to merge. That letter does state that the wine franchise law would apply. It's stated in the context of this is the standard by which Gallo should judge whether or not to approve the merger. The letter then says, we hope to complete this by June the 1st. On pages 90 and 91 of the record, Mr. Backus responds. He asks for more information. No question about the wine franchise law raised. On pages 93 and 94, in June, there's a letter from Mr. Weston Dawks of Gallo saying that asking questions about some additional information and saying that the wine franchise law does not apply. There's never any further mention of the wine franchise law in the correspondence that goes back and forth. You have subsequent letters, pages 96, 98, 99, 101, 102 of the record, in which there's requests for information, are you going to give us this information, attempts to convince Gallo, but no further mention of the wine franchise law, no mention that Blue Ridge intends at any point to merge without the consent of Gallo. You know, it sounds like you're getting along so fine. I really hate to see this longstanding business relationship marred by uncertainty and litigation. And I wonder, regardless of what happens here, wouldn't everybody be better off if your client and Gallo reached an understanding that this wouldn't happen without Gallo's consent and, you know, there's no, you know, mistrust in business is a terrible thing. It's not good for anybody. And, you know, lawyers are too often sort of these days fighters rather than peacemakers. Maybe the counsel can go to lunch together and work out, you know, that's what we do, work out something that will make this business, I mean, it's been a business relationship for over 20 years, and that's only the last iteration, right? It probably goes back long before that. And, boy, you know, things would interest of everybody would be greatly served if counsel could just, I mean, it sounds to me like a misunderstanding, like something happened and it was taken the wrong way. Sometimes it happens in marriages too, you know, people, and you just need somebody coming along and sort of helping along. And the business has gone on, and it has gone on successfully for the two-and-a-half years since the merger, since the transfer of beer to United. The counsel here seems to me to be so reasonable and, you know, so well aware of the situation. Can I suggest that, you know, it's very close to lunchtime here. There are excellent restaurants in San Francisco. Let me just suggest, counsel, try to solve this problem. Do their clients a favor by sort of backing them away from litigation and acting as counselors. And, Your Honor, that is exactly what Blue Ridge did here. Blue Ridge, in no point in this, in no point in these discussions. Let's not point the finger. I think we understand the position of both parties. And I'm just suggesting that maybe we bring this case. You know, we will rule as we will rule. But I think whatever we do, I think now a counselor here, you've heard us talk. You've heard each other. And it seems there's such reasonable counsel here, both of you. May I just suggest that you take this opportunity to try to build on this experience for a better legal and business relationship for your clients. Is that something you might be interested in, Mr. Edwards? Yes, Your Honor. Obviously, we'd be interested in that. I don't think either party likes litigation. But as I heard Mr. Crowell's responses to Judge Fisher, that if this issue comes up, and they have no plans right now, but if it does come up again, we'll get notice and an opportunity if we decide to, to try and have this issue heard again in Fresno. Sometimes a lawyer's handshake is better than a stipulation or anything else. Both are honorable counsel here, representing their clients zealously and in good faith. And I think, again, we will submit the case and we'll rule on it. But the more important thing, it seems to me, is the relationship between the clients. And this is where counsel can come in and help. Let me just suggest that you are here. You're in the same city. Are you local, Mr. Edwards? I'm far more local than Mr. Crowell. I don't know where Kings Beach is. So you take the lunch. I have to apologize in that I have a luncheon engagement. It's not a personal thing. Your Honor, we'll talk. We'll talk in any event, even if not lunch, maybe dinner or something of that sort. I do see an opportunity. Again, we have counsel who look experienced and well aware of the situation and well versed in these matters. And I think you can really help here. Could I just add, to focus the issue from my standpoint, the dilemma that we as a court face, of course, in these kinds of cases, is a judgment as to whether we are being asked to intervene prematurely in a situation that, as Judge Kosinski has excellently pointed out, could be resolved by a mutual understanding that the legal debate being postponed is because of the merits that the judiciary is concerned about, that we don't intrude on North Carolina's franchise law unless we're actually absolutely needed to do so. And on the other hand, that that reticence on our part isn't being used as a device to get a hometown advantage. So we don't get drawn into that kind of process. And I commend to you Judge Kosinski's words that the court not be called upon to have to referee a dispute, that I'm quite impressed both of you gentlemen have represented your clients well and candidly, and I think that would be, I echo what Judge Kosinski has to say. May I make one comment? I advise a number of beer and wine wholesalers in North Carolina, and they are, the franchise laws are at the heart of their business, and they believe they're critical to them, but what I'm constantly telling them is, and what they appreciate, and I think what Blue Ridge appreciates is, this is a business, and if you don't get along with your winery or your brewery, what the wine franchise or the beer franchise law provides as far as protecting your rights, keeping you from being terminated, isn't going to make a heck of a lot of difference. There are a zillion ways that a winery or brewery can make life difficult for you if you're not getting along well, and even though you may have rights to transfer, if the winery or brewery isn't satisfied with who they're going to be doing business with, it's not going to work. It's the business relationship that needs to be established. Can I suggest that we have a very excellent mediation service here at the Ninth Circuit, really excellent. So if you, the lunch doesn't work or the coffee and tea doesn't work, and our mediation unit can be of any help, just let us know. We actually went through the mediation. We've actually had a separate attempt in North Carolina, independent attempt at mediation. That was then. This is now. It's not worked so far, but we're certainly open to it. We did do that, Your Honor, and we will talk, but I think based upon the representations that Mr. Crowell made in response to your questions, we'll be able to resolve this. Okay. Thank you very much. Okay, counsel. Thank you very much. That has been very helpful.
judges: Kozinski, Fisher, Block